No. 14-1691

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

IN RE:  ROBERT E. MURPHY,

Debtor

_____

ROBERT E. MURPHY,

Appellant,

v.

U.S. DEPARTMENT OF EDUCIATION; EDUCATIONAL CREDIT MANAGEMENT
CORPORATION

Appellees,

SALLIE MAE, INC.; COLLEGE BOARD

Interested Parties.

_____

On Appeal From the United States District Court
For the District of Massachusetts

_____

BRIEF FOR THE UNITED STATES AS
AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

_____

BENJAMIN C. MIZER
  Principal Deputy Assistant Attorney General
CARMEN M. ORTIZ
  United States Attorney
MICHAEL S. RAAB
(202) 514-4053
JEFFREY CLAIR
(202) 514-4028
jeffrey.clair@usdoj.gov
  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................ 1

QUESTION RESENTED ....................................................... 2

STATEMENT ................................................................... 2

ARGUMENT ...................................................................... 9

I.    The Court Should Adopt the Second Circuit's *Brunner* Test For Determining Whether A Borrower Will Face An "Undue Hardship" If Student Loan Debts Are Not Discharged In Bankruptcy ................................................... 9

    A.    *Brunner's* Requirement of A "Good Faith" Effort To Repay The Loan Is Consistent With The Text Of The Discharge Provision and Congress's Intent To Prevent Abuse of the Bankruptcy Process ............................................ 12

    B.    *Brunner's* Requirement That There Be "Additional Circumstances" Warranting Discharge is Consistent With Congress's Intent To Prioritize Student Loan Repayment Over The "Fresh Start" Policies of The Bankruptcy Code .................................................................. 20

    C.    The Totality of Circumstances Test Is Inconsistent With Congress's Intent To Impose Strict Limitations On the Discharge Of Student Loan Debt In Bankruptcy ......... 23

II.    Whether A. Debtor Has Reasonably Sought Relief Available Under The Department of Education's Income-Contingent Repayment Plan Should Be Given Significant Weight In Determining Whether Student Loan Debt May Be Discharged In Bankruptcy ...................................................................... 26

i

III.    The Debtor's Age Is Not An Independent Factor Supporting
        Discharge of a PLUS Loan................................................................ 30

CONCLUSION ...................................................................................................... 32

FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Page**

*Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932) .................14

*Barber v. Thomas*, 560 U.S. 474 (2010) .................................................................14

*Brunner v. N.Y. State Higher Educ. Servs.*, 831 F.2d 395
   (2d Cir. 1987) ...........................................................................................8, 10, 21

*Educational Credit Mgmt. Corp. v. Bronsdon*, 421 B.R. 27
   (D. Mass. 2009)......................................................................................................29

*Educational Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302
   (10th Cir. 2004)...........................................................................10, 15, 19, 20, 25

*General Dynamics Land Systems, Inc. v. Cline*, 540 U. S. 581 (2004)...................14

*Grogan v. Garner*, 498 U.S. 279 (1991)...........................................................5, 7

*In re Bronsdon*, 435 B.R. 791 (B.A.P. 1st Cir. 2010)............................................... 7

*In re Cox*, 338 F.3d 1238 (11th Cir. 2003) ..................................................10, 19, 25

*In re Faish*, 72 F.3d 298 (3d Cir. 1995)........................................................10, 22, 25

*In re Frushour*, 433 F.3d 393 (4th Cir. 2005)......................................10, 19, 21, 22

*In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003)...............................................10, 19, 23

*In re Long*, 322 F.3d 549 (8th Cir. 2003) ........................................................10, 24

*In re Nash*, 446 F.3d 188 (1st Cir. 2006)......................................................11, 20, 21

*In re Nys*, 446 F.3d 938  (9th Cir. 2006)      . .. . . . . . . . . . .. . . . . . .  . . . . . . . . . .23

*In re Pelkowski*, 990 F.2d 737 (3d Cir. 1993)...................................................15, 25

*In re Pena*,155 F.3d 1108 (9th Cir. 1998) .............................................................10

*In re Reynolds*, 425 F.3d 526 (8th Cir. 2005) ...........................................................24

*In re Rifino*, 245 F.3d 1083 (9th Cir. 2001) ............................................................22

*In the Matter or Roberson*, 999 F.2d 1132 (7th Cir. 1993) .....................................23

*In re Oyler*, 397 F.3d at 386 ..............................................................................22, 23

*Krieger* v. *Educational Credit Mgmt. Corp.*,
   713 F.3d 882  (7th Cir. 2013). .. .. . . . . .  . . . . . . .  . . . . . . .  . . . . . . . . . . . 29, 31

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) ......................................................14

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) .................14

## Statutes:

Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 523(a)(8), 92 Stat. 2549,
   2591 (1978) ......................................................................................................... 17

Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, §
2201, 124 Stat. 1029, 1074–75;  20 U.S.C. 1087a *et seq* ......................................... 4

Title IV, Part B of the Higher Education Act, 20 U.S.C. 1071 *et seq* ...................... 2

   20 U.S.C. 1078(b)(1), (c) ....................................................................................3
   20 U.S.C. 1078(c)(1) &(2) ..................................................................................4
   20 U.S.C. 1078(c)(1)(A) .....................................................................................4
   20 U.S.C. 1078(c)(2)(A) ......................................................................................4
   20 U.S.C. 1078(c)(2)(D), (c)(6) ..........................................................................4
   20 U.S.C. 1078-2(a)(1)(A) ...................................................................................3

Pub. L. No. 89-329, 79 Stat. 1232-1254 ................................................................. 1

Pub. L. No. 91-354, 84 Stat. 468 (1970) ................................................................ 15

Pub. L. No. 94-482, § 439A, 90 Stat. 2081, 2141 (1976) ....................................... 16

Pub. L. No. 101-647, § 3621, 104 Stat. 4789, 4964-65 (1990) .............................. 18

Pub. L. No. 105-244, § 971, 112 Stat. 1581, 1837 (1998)....................................... 18


11 U.S.C. 523(a)(8).............................................................................................passim
11 U.S.C. 524(a) ..............................................................................................5, 20
11 U.S.C. 524(c)(3)(B) .........................................................................................13
11 U.S.C. 528(a)(8)................................................................................................7
11 U.S.C. 727 .......................................................................................................5

26 U.S.C. 61(a)(12), 108(a)(1)(B), 108(a)(3) .........................................................29

## Regulations:

34 C.F.R. 682.201(c)(vii) .......................................................................................3
34 C.F.R. 682.204(g) ............................................................................................3
34 C.F.R. 682.209(a)(2)(i) .....................................................................................3
34 C.F.R. 682.209(a)(7) .........................................................................................3
34 C.F.R. 682.210(s)(5) & (6) ...............................................................................4
34 C.F.R. 682.211 .................................................................................................4
34 C.F.R. 682.410(b)(6)..........................................................................................4
34 C.F.R. 685.209(b)(1).........................................................................................26
34 C.F.R. 685.209(b)(1)(ii) & (iii)(A) ...................................................................26
34 C.F.R. 685.209(b)(1)(v)................................................................................26, 27
34 C.F.R. 685.209(b)(3)(iii)(A) .............................................................................26
34 C.F.R. 685.209(iii)(D) ......................................................................................27


## Legislative Materials:

H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pt. II, at 140 (1973) ......................... 16

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 365-66 (1977), *reprinted in* 1978
        U.S.C.C.A.N. 5963, 6098-95 ..................................................................... 14, 17

H.R. Rep. No. 105-170, 105th Cong., 2d Sess 408 (1998)..................................... 29

S. Rep. No. 94-882, 94th Cong., 2d Sess. 32 (1976), *reprinted in* 1976

U.S.C.C.A.N. 4713, 4744 ................................................................ 17

124 Cong. Rec. 1791, 1792 (1978) ............................................... 18

144 Cong. Rec. 22,680 (1998) ...................................................... 29

**Miscellaneous:**

*American Heritage Dictionary of the English Language* at 1878 (4th ed. 2006) .. 12

*Webster's Third New International Dictionary* at 2492 (1993) ............................ 12

## STATEMENT OF INTEREST

To help students and their families pay for college, the Department of Education makes available billions of dollars in federal student loans each year through programs authorized under Title IV of the Higher Education Act of 1965, *as amended*, Pub. L. No. 89-329, 79 Stat. 1232-1254. Outstanding student loan balances in the United States exceed $1 trillion, more than any other type of household debt with the exception of mortgages, and the Department projects it will make more than $109 billion in new federal student loans in FY 2016.  As of September 2013, however, about one out of seven student loan borrowers had defaulted on their loan within three years of beginning repayment, and approximately $94 billion of over $814 billion in outstanding federal student loans in repayment was in default.

The fiscal integrity of the student loan program depends on ensuring that student loans are repaid where feasible.  Congress has accordingly authorized the Department of Education to offer a variety of extended and income-driven repayment plans, debt forbearance, payment deferment, and administrative discharge options to assist debtors in making repayment or obtaining relief from debt burdens.  At the same time, Congress has placed strict statutory limitations on a borrower's ability to permanently discharge

student loans in bankruptcy.  The Bankruptcy Code thus provides that

student loans may not be discharged unless the borrower demonstrates

"undue hardship." 11 U.S.C. 523(a)(8).

The availability of an "undue hardship" discharge in bankruptcy bears

directly on the Department of Education's ability to protect the fiscal

stability of the loan program.  The federal government respectfully submits

this brief as amicus curiae to address the appropriate standards for

determining whether to discharge a student loan in bankruptcy.

## QUESTION PRESENTED

The plaintiff-appellant has appealed an order holding that loans he

obtained under the Federal Family Education Loan Program to finance his

children's college education are not dischargeable in bankruptcy.  The

questions presented concern the appropriate construction and application of

11 U.S.C. 523(a)(8), which provides in pertinent part that federal student

loans are not dischargeable in bankruptcy unless failing to discharge the debt

would impose an "undue hardship" on the debtor and his dependents.

## STATEMENT

**1.**  The loans at issue in this case were authorized by the Federal

Family Education Loan Program (FFELP).  FFELP was established under

Title IV, Part B of the Higher Education Act, 20 U.S.C. 1071 *et seq.*  It

2

enabled students and parents of students to obtain low interest loans from private lenders to help finance the cost of a student's postsecondary education. These loans were guaranteed by participating state agencies or nonprofit private organizations and were reinsured and often subsidized by the United States Department of Education. 20 U.S.C. 1078(b)(1), (c).

The debtor's loans here are a type of FFELP known as PLUS loans. PLUS loans enabled parents to borrow up to the full cost of a dependent child's attendance at an undergraduate institution (less any financial aid the student received) and could thus be quite large. 34 C.F.R. 682.204(g). Moreover, although parents with an adverse credit record (such a prior loan default) were ineligible for PLUS loans, the statute did not require the parent borrower to demonstrate that he or she had good credit or sufficient resources to repay the loan. 20 U.S.C. 1078-2(a)(1)(A); 34 C.F.R. 682.201(c)(vii).

The repayment period for a PLUS loan begins on the date of the last disbursement of the loan. The first payment is ordinarily due within 60 days after the loan is fully disbursed. 34 C.F.R. 682.209(a)(2)(i). Borrowers may repay the loan over a term of 10 to 25 years, depending on the repayment plan selected. 34 C.F.R. 682.209(a)(7). Borrowers may also obtain temporary deferment or forbearance of the repayment obligation in several

circumstances, including periods of unemployment or economic hardship. 34 C.F.R. 682.210(s)(5) & (6); 34 C.F.R. 682.211.

If a borrower defaults on a PLUS loan, the guarantee agency reimburses the holder of the note and takes assignment of the loan. 20 U.S.C. 1078(c)(1) &(2). The Department of Education then reimburses the guarantee agency for a percentage of the payment the guarantee agency made to the lender. 20 U.S.C. 1078(c)(1)(A). The guarantee agency must then exercise "due diligence" to collect the debt, 20 U.S.C. 1078(c)(2)(A); 34 C.F.R. 682.410(b)(6) (setting forth required collection efforts), and must remit to the Department of Education a statutorily prescribed portion of its direct recoveries.[1] 20 U.S.C. 1078(c)(2)(D), (c)(6).

**2.** Section 523(a)(8) of the Bankruptcy Code provides that obligations under federal student loan programs are not dischargeable in bankruptcy unless the failure to discharge the loan would impose an undue hardship on

---

[1] The Higher Education Act was amended to terminate authority to provide FFELP reinsurance and subsidies for loans made on or after July 1, 2010. Loans with the identical terms as those available under FFELP for parents and undergraduate students are now made available through a direct loan program under which the federal government makes loans directly to students and parents, rather than subsidizing and reinsuring loans made by private lenders. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 2201, 124 Stat. 1029, 1074–75; 20 U.S.C. 1087a *et seq*.

the debtor or his or her dependents.  The Code generally provides that, in a proceeding under chapter 7 for liquidation and distribution of the debtor's assets, the debtor is entitled to a discharge of further liability on the claims against him at the conclusion of the case.[2]  11 U.S.C. 727.  The discharge operates as an injunction against the commencement or continuation of actions to collect or recover on pre-petition debts, 11 U.S.C. 524(a), and is at the heart of the Code's policy of affording insolvent debtors an opportunity to make peace with their creditors and have a fresh start.  *See generally Grogan v. Garner,* 498 U.S. 279, 286 (1991).  The Code, however, specifically excludes from the general policy of discharge certain specific debts.  The Supreme Court has held that:

> The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts--such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud.  Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start.

*Id*. at 287.

Section 523(a)(8) sets forth the statutory exclusion of federal student loans from the Code's general discharge.  It states in pertinent part that a

---

[2] Section 523 also applies to bankruptcies commenced under chapters 11, 12, and 13 of the Code.  Many student loan bankruptcies are commenced under chapter 13.

discharge under the Code does not discharge an individual debtor from any debt for an educational loan "made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution" unless "excepting such debt from discharge * * * would impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. 523(a)(8).

**3.**  This case arises out of an appeal by the debtor, Robert Murphy, from a judgment holding that PLUS loans he took out to finance his children's college education are not dischargeable in bankruptcy.  Murphy took out twelve PLUS loans between 2001 and 2007 in the total amount of $220,765.  Appellant Supp. Br. 2.  All but three loans were consolidated, and all of the loans are held by the Educational Credit Management Corporation. *Id*. at 3.  Murphy had been president of a major corporation and in his last year with the company had a salary of $165,000 with potential for an additional 50% bonus.  Appellant Br. 13.  In 2002, however, Murphy's employment was terminated after the corporation was sold and its operations moved overseas.   Murphy has been unemployed since that time.  *Id.* at 13-16.

**a.**  Murphy filed a voluntary petition for bankruptcy under Chapter 7 of the Code.  On January 9, 2012, he filed an adversary complaint seeking

discharge of his student loan debt under 11 U.S.C. 528(a)(8).  Bankr. Ct. No.
11-19098, Clerk's Record ("CR.") 48.  The complaint named ten parties as
defendants, including the original lenders, loan servicers, loan guarantors,
and the Department of Education.  *Id*.

**b.**  On February 20, 2013, the bankruptcy court held that defendant
Educational Credit Management Corporation's claims against the debtor are
not dischargeable in bankruptcy.  Bankr. Ct. No. 12-01003, CR. 68.  The
court, citing the Bankruptcy Appellate Panel's decision in *In re Bronsdon*,
435 B.R. 791 (B.A.P. 1st Cir. 2010), applied the "totality of circumstances"
test in determining whether the failure to discharge Murphy's PLUS loans
would impose an "undue hardship."  It noted that this standard permitted it
to consider the debtor's income and expenses, age, education, number of
dependents, other personal and family circumstances, and ability to increase
income or cut expenses.  It reasoned that debtor had been a high earner
during his career, that although he was near retirement age (age 62 at the
time of the decision), he remained in good health and had no known
illnesses, and that, despite a long period of unemployment, he had not
established that he would be unable to pay all or a significant portion of the
debt in the future, especially now that his children are grown and that he is,
as a result of the bankruptcy discharge, unburdened from other debt.

**c.** The district court affirmed.  The court concluded that although the totality of circumstances test "has flaws, pliancy among them," it does not significantly differ from the standards developed in *Brunner* v. *N.Y. State Higher Educ. Servs.,* 831 F.2d 395 (2d Cir. 1987), which sets forth the test now used in nine courts of appeals. Op. 3 & n.1.  The court stated without further explanation that it would apply the totality of circumstances test here, reasoning that the test "boils down to one question:  'Can the debtor now, and in the foreseeable future, maintain a reasonable, minimal standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?'"  *Id*. at 3.

The court held that the debtor had not carried his burden of establishing undue hardship under this standard.  It noted that Congress had chosen to prioritize the financial integrity of the federal student loan programs over the Bankruptcy Code's general policy of affording debtors a "fresh start," and that discharges for undue hardship are consequently granted only in truly exceptional circumstances.  Op. 4.  The court found that although Murphy is in financial straits, he had not established that his prospects of increasing future income are so remote as to warrant a discharge.  It noted that Murphy had a master's degree and had held high-earning jobs in the past, that he remained in good health, and that his

8

children were grown and no longer a financial burden. *Id.* at 7. The court further noted that Murphy was already unemployed when he took out the majority of the loans at issue here, that the risks of future difficulties in repaying the loans were already apparent at that time, and that "the fact that this risk has become a reality does not make his hardship 'undue.'" *Id.* at 8. The court, however, though finding that Murphy had not established undue hardship, did not place great emphasis on Murphy's failure to explore relief under the Department of Education's income-contingent repayment program. It reasoned that this payment option could prove especially detrimental if the debtor were ultimately unable to make full payment, the debt were cancelled in whole or in part, and the debtor subsequently incurred additional tax liability as a result. The court therefore concluded that Murphy's failure to apply for relief under this program did not have significant bearing on whether he would be entitled to a bankruptcy discharge. *Id.* at 6.

## ARGUMENT

I.    The Court Should Adopt The Second Circuit's *Brunner* Test For Determining Whether A Borrower Will Face An "Undue Hardship" If Student Loan Debts Are Not Discharged In Bankruptcy.

The Bankruptcy Code does not define what constitutes "undue hardship" for purposes of permitting a permanent discharge of the debt

9

under 11 U.S.C. 523(a)(8), and questions as to the appropriate standards for applying this provisions have engendered considerable appellate litigation.

In *Brunner* v. *N.Y. State Higher Educ. Servs. Corp.,* 831 F.2d 395 (2d Cir. 1987), the Second Circuit adopted a three-part test for "undue hardship" requiring the debtor to show that:

(1) he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loan,

(2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan, and

(3) he has made good faith efforts to repay the loan.

*Id.* at 396.

Eight other Circuits subsequently adopted the *Brunner* test for determining whether excepting a debtor's student loans from discharge would impose an undue hardship.[3]

In *In re Long,* 322 F.3d 549 (8th Cir. 2003), however, the Eighth Circuit rejected the *Brunner* test in favor of a less restrictive "totality of circumstances" test. The court reasoned that requiring bankruptcy courts to

---

[3] *See In re Faish*, 72 F.3d 298 (3d Cir. 1995); *In re Frushour*, 433 F.3d 393 (4th Cir. 2005); *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003); *In re Oyler*, 397 F.3d 382 (6th Cir. 2005); *In the Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993); *In re Pena,*155 F.3d 1108 (9th Cir. 1998); *Educational Credit Mgmt. Corp.* v. *Polleys*, 356 F.3d 1302 (10th Cir. 2004); *In re Cox*, 338 F.3d 1238 (11th Cir. 2003).

adhere to the strict parameters of the *Brunner* test would diminish the

discretion afforded by section 523(a)(8)(B). *Id.* at 554. The court held that

bankruptcy courts should consider the "unique facts and circumstances that

surround the particular bankruptcy" and review:

> (1) the debtor's past, present, and reasonably reliable future financial resources,

> (2) the debtor's reasonable, necessary living expenses, and

> (3) any other relevant facts and circumstances surrounding each particular bankruptcy case.

*Id.*

This Court has thus far not deemed it necessary to adopt either of

these tests. In *In re Nash*, 446 F.3d 188 (1st Cir. 2006), the Court's most

recent decision to consider student loan dischargeability, the debtor asserted

that she was prevented from working and paying off her student loans by a

disability, and that withholding a discharge from her would impose an undue

hardship. The Court reasoned that under either of the standards adopted by

other courts of appeals, the debtor would have to demonstrate that her

disability would prevent her from working for the foreseeable future, and

that there was thus no need to decide more general standards for construing

"undue hardship." *Id.* at 190-91.

11

The *Brunner* test and the "totality of circumstances" test both focus on whether the debtor has sufficient present and future income and resources to maintain a reasonable, minimal standard of living while repaying the loan. But *Brunner*, by also requiring good faith efforts to repay the loan and proof of additional circumstances beyond the debtor's mere insolvency, better effectuates Congress's overriding purpose of ensuring that borrowers do not use bankruptcy as an expedient means of freeing themselves from an obligation to repay the funds used to finance their own or their children's education. The Court should therefore join nine other Circuits and adopt the *Brunner* test here.

> A.  *Brunner's* Requirement of A "Good Faith" Effort To Repay The Loan Is Consistent With The Text Of The Discharge Provision and Congress's Intent To Prevent Abuse of the Bankruptcy Process.

*Brunner's* "good faith" requirement is fully consistent with the plain meaning of 11 U.S.C. 523(a)(8). "Undue" hardship encompasses economic burdens that are excessive or overly burdensome. That is a key consideration under both the *Brunner* and "totality of circumstances" tests, and we do not understand any of parties or their amici to disagree. The ordinary meaning of "undue" hardship, however, also connotes a hardship that is unjust or undeserved. *See, e.g., American Heritage Dictionary of the English Language* at 1878 (4th ed. 2006) (defining "undue" as both

12

"excessive" or "[n]ot just, proper, or legal"); *Webster's Third New International Dictionary* at 2492 (1993) (defining "undue" as exceeding "propriety or fitness"). Inquiring as to whether the debtor has made a sincere and concerted effort to honor a promise to repay the loan is relevant to whether leaving the debt obligation in place would be an "undue" hardship in that sense of the word. The *Brunner* test properly takes this meaning of the term into account by limiting a section 523(a)(8) discharge to debtors who have made a "good faith" effort to repay their loan before seeking relief in bankruptcy.

Professor Pardo, one of the debtor's amici, nonetheless argues that a "good faith" requirement is inconsistent with the statutory text and structure. He reasons that in 11 U.S.C. 524(c)(3)(B), Congress provided that a court may not enforce a debtor's agreement to reaffirm a dischargeable debt if the agreement would impose an "undue hardship" on the debtor, that the term under that provision has been construed to be concerned solely with the prospective economic burden of repaying the loan, and that the presumption of consistent usage requires that the term be similarly construed under 11 U.S.C. 523(a)(8). Pardo Amicus Br. 11-16.

This contention cannot be reconciled with Congress's intent to ensure that student loan debtors do not abuse the bankruptcy process and is by no

means compelled by the construction placed on a different provision of the Code. It is well settled that the presumption of consistent usage can be rebutted by contextual indications that Congress intended the same term to convey different meanings:

> [T]his presumption is not absolute. It yields readily to indications that the same phrase used in different parts of the same statute means different things, particularly where the phrase is one that speakers can easily use in different ways without risk of confusion. *Barber* v. *Thomas*, 560 U.S. 474, 484 (2010) (citations omitted).

Here, the reaffirmation and discharge provisions serve fundamentally different purposes and there is no indication that Congress intended the term "undue hardship" to have the same meaning in both sections of the Code. The reaffirmation provision is forward-looking and addresses whether it would be inappropriate to permit the debtor to reassume a debt that is *dischargeable* in bankruptcy. It is intended to ensure that creditors not defeat the "fresh start" policies of the Code by unfairly pressuring debtors to reassume unmanageable obligations that Congress has expressly made dischargeable. *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 365-66 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6098-95.

Section 523(a)(8) serves a different purpose. It is intended to ensure that debts that are presumptively *nondischargeable* are not excused absent compelling reasons. The legislative history, moreover, makes clear that

14

Congress was particularly concerned, not merely with the debtor's prospective ability to repay, but with whether the debtor is attempting to use the bankruptcy process as a convenient means of extinguishing student loan debt without ever having made a sincere and concerted to repay it—a purpose that is well-served by *Brunner*'s good faith requirement.

As the Third Circuit has explained, "[i]t is undisputed that section 523(a)(8) was enacted in response to the belief that students were taking advantage of the loan program," and the debate over its passage "focused on the twin goals of rescuing the student loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving debtors." *In re Pelkowski*, 990 F.2d 737, 742, 743 (3d Cir. 1993); *accord Educational Credit Mgmt. Corp.* v. *Polleys*, 356 F.3d 1302, 1306 (10th Cir. 2004).

The problem of student debtor abuse of bankruptcy was highlighted in a 1973 report of the Commission on the Bankruptcy Laws of the United States.[4]  The Commission found evidence that student loan borrowers were abusing the bankruptcy process and recommended a legislative amendment to "respond[] to the rising incidence of consumer bankruptcies of former students motivated primarily to avoid payment of educational loan debts." *Report of the Commission on the Bankruptcy Laws of the United States*,

---

[4] The Commission was established by Pub. L. No. 91-354, 84 Stat. 468 (1970), and charged with recommending changes in the Bankruptcy Act.

H.R. Doc. No. 93-137, 93d Cong., 1st Sess., pt. II, at 140 (1973); *see also id.*
Pt., at 176. It accordingly proposed legislation excepting from discharge
"any educational debt if the first payment of any installment thereof was due
on a date less than five years prior to the date of the [bankruptcy] petition
and if its payment from future income or other wealth will not impose an
undue hardship on the debtor and his dependents." *Id.*, pt. II, at 136,
proposed legislation section 4-506(a)(8).

Similar provisions were first enacted in 1976 as an amendment to
Higher Education Act. Pub. L. No. 94-482, § 439A, 90 Stat. 2081, 2141
(1976). The amendment provided that student loans could only be
discharged in bankruptcy in two circumstances: five years after
commencement of the repayment period, or, in the period prior to expiration
of the five-year waiting period, if the court "determines that payment from
future income or other wealth will impose an undue hardship on the debtor
or his dependents." Congress explained that the provision "seeks to
eliminate the defense of bankruptcy for a five-year period, to avoid the
situation where a student, upon graduation, files for a discharge of his
obligation in bankruptcy, then enters upon his working career free of the
debt he rightfully owes. After a five-year period, an individual who has
been faithfully repaying his loan may really become bankrupt. He should

16

not be denied this right." S. Rep. No. 94-882, 94th Cong., 2d Sess. 32

(1976), *reprinted in* 1976 U.S.C.C.A.N. 4713, 4744.

In 1978, Congress enacted essentially the same provision as section

523(a)(8) of the new Bankruptcy Code, thus providing that student loan debt

could be discharged five years after commencement of the repayment period

but not could be discharged before that time absent undue hardship to the

debtor or his dependents.  Bankruptcy Reform Act of 1978, Pub. L. No. 95-

598, § 523(a)(8), 92 Stat. 2549, 2591 (1978).

The House Judiciary Committee questioned the need for provisions

excepting student loans from discharge, reasoning that there was no

evidence of a disproportionate increase in the number of student loan

borrowers seeking discharge in bankruptcy, and that excepting such loans

from discharge was not consistent with the "fresh start" policies of the

bankruptcy law.  H. R. Rep. No. 95-595, 95th Cong., 1st Sess. at 132-134

(1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6093-95.

That view, however, did not prevail.  Congress instead enacted

provisions excepting student loan debt from discharge absent undue

hardship.  The provisions were set forth in a floor amendment offered by

Representative Ertel who explained that it was intended to prevent student

loan borrowers from abusing the bankruptcy process.  124 Cong. Rec. 1791,

17

1792 (1978).  As one legislator noted, "the intent of the Ertel amendment is to prevent abuse of our student loan program by those would use bankruptcy simply to avoid repayment of their student loans." *Id*. at 1794 (1978) (remarks of Rep. Cornell).

Subsequent amendments further narrowed the circumstances in which a debtor could obtain a discharge of student loans.  In 1990, Congress amended the law to provide that a loan must be in repayment status for seven years (rather than five) before a discharge could be granted without a showing of undue hardship.  Pub. L. No. 101-647, § 3621, 104 Stat. 4789, 4964-65 (1990).   And in 1998, Congress eliminated provisions authorizing discharge if the loan has been in repayment status for seven years, thereby providing that a discharge may not be granted in any circumstance absent a showing of undue hardship.  Pub. L. No. 105-244, § 971, 112 Stat. 1581, 1837 (1998).

The evolution and legislative history of section 523(a)(8) thus reflect a clear congressional intent to withhold the discharge from undeserving debtors who were seeking quick and easy relief from student loan obligations.  Congress repeatedly noted that the provision was intended to impose a check on abuse of the bankruptcy process by denying the discharge to debtors who seek relief in bankruptcy without making a meaningful effort

18

to repay their loan.  The legislative determination is that it is not an "undue" hardship to deny a discharge to a debtor who has not satisfied this obligation.  Unlike the totality of circumstances test, *Brunner's* requirement that a debtor have made a "good faith" effort to repay the loan furthers this key congressional purpose.

Debtor and his amici, the National Consumer Law Center and National Association of Consumer Bankruptcy Attorneys, argue that the statutory amendments enacted after *Brunner* was decided, in conjunction with an expansion of the ability to collect student loans through wage garnishment, tax refund intercepts, and other remedies, have rendered *Brunner*'s "good faith" requirement obsolete.

We respectfully disagree.  Many of the courts of appeals that have adopted the *Brunner* test did so well after the 1990 and 1998 amendments cited by the debtor's amici.[5]  That is not surprising.  The effect of the 1990 and 1998 amendments to the discharge exception is to require a debtor to demonstrate undue hardship *regardless* of how long the loan has been in repayment status—a result that reflects Congress's intent to require good

---

[5] *See In re Frushour*, 433 F.3d 393 (4th Cir. 2005); *In re Gerhardt*, 348 F.3d 89 (5th Cir. 2003); *In re Oyler*, 397 F.3d 382 (6th Cir. 2005); *Educational Credit Mgmt. Corp.* v. *Polleys*, 356 F.3d 1302 (10th Cir. 2004); *In re Cox*, 338 F.3d 1238 (11th Cir. 2003).

19

faith efforts to repay the loan *throughout* the repayment period, not merely for some limited period of time after the repayment period commences. And while authority to garnish a borrower's wages and other collection remedies do enhance the ability to recover from a defaulting debtor, those remedies are useless if the loan is discharged in bankruptcy, because the discharge will operate as an injunction barring any such collection efforts. *See* 11 U.S.C. 524(a). Rigorous enforcement of a requirement that a discharge be withheld absent good faith efforts to make repayment thus remains essential to vindicating Congress's intent. *See Polleys*, 356 F.3d at 1307 n.2 (after 1998 amendments, only means of discharging student loan debt is to demonstrate undue hardship). That is, in and of itself, a persuasive reason for this Court to join the nine other courts of appeals that have adopted the *Brunner* test.

> B. *Brunner's* Requirement That There Be "Additional Circumstances" Warranting Discharge Is Consistent With Congress's Intent To Prioritize Student Loan Repayment Over The "Fresh Start" Policies of The Bankruptcy Code.

In *In re Nash*, the Court noted that a debtor seeking to discharge student loan debt "has a formidable task, for Congress has made the judgment that the general purpose of the Bankruptcy Code to give honest debtors a fresh start does not automatically apply to student loan debtors. Rather, the interest in ensuring the continued viability of the student loan

20

program takes precedence." 446 F.3d at 191. The *Brunner* test vindicates this objective by requiring, not only that a debtor demonstrate inability to repay in the present and near future, but that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan." *Brunner*, 831 F.2d at 396.

The debtor and his amici argue that the "additional circumstances" criterion has no basis in the text of the statute and imposes a barrier to discharge that was not intended by Congress. The text and purposes of the discharge exception, however, all support this aspect of the *Brunner* test. As the Fourth Circuit reasoned, "[b]ecause Congress selected the word 'undue,' the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient; otherwise all bankruptcy litigants would have undue hardship." *In re Frushour*, 433 F.3d 393, 399 (4th Cir. 2005). Thus, "[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for discharge of student loans." *Id.* (brackets in original) (quoting *In re Rifino*, 245 F.3d 1083, 1087 (9th Cir. 2001)). There must be something more—"additional circumstances" that warrant departing from Congress's decision to except student loan debt the Code's more general discharge policy.

This heightened standard is consistent with the purposes of federal student loan program and the bargain each borrower strikes with the federal government in gaining access to an invaluable educational benefit. Unlike most other loans, a borrower may obtain a student loan without security, cosigners, or demonstrated creditworthiness. The government's only financial protection lies in the debtor's commitment to honor the obligation to repay the loan, and to use future earnings and resources obtained over the entire course of the loan term to make good on that promise. The *quid pro quo* for these generous terms is that the loan obligation must remain in force after bankruptcy "in all but the most dire circumstances" and cannot be excused absent a demonstrated inability to make payment both now and in the future. *In re Frushour*, 433 F.3d at 399; *accord In re Faish*, 72 F.3d 298, 306 (3d Cir. 1995) (discharge not permitted "merely because repayment of the borrowed funds would require some major personal and financial sacrifices'); *Oyler*, 397 F.3d at 386 (discharge permissible only if there is a "certainty of hopelessness [of repayment], not merely a present inability to fulfill financial commitment"); *Matter or Roberson*, 999 F.2d 1132, 1136 (7th Cir. 1993) (same); *In re Gerhardt*, 348 F.3d 89, 92 (5th Cir. 2003) (debtor must specifically prove a total incapacity in the future to repay the debt for reasons not within his control).

*Brunner* does not impose a per se prohibition on discharge.  *Polleys*, 356 F.3d at 1309.  It permits the court to consider all the relevant facts and circumstances bearing on the debtor's ability to repay, including disability, dependent obligations, lack of suitable education or skills, and lack of better financial options elsewhere.  *See, e.g., In re Nys*, 446 F.3d 938, 947 (9th Cir. 2006); *Oyler*, 397 F.3d at 386.  The "additional circumstances" criterion nonetheless ensures that discharge is not available in the usual circumstances permitting discharge of other debts in bankruptcy.   It holds the borrower to his or her promise to use future earnings and resources obtained over the course of the entire loan term to meet the loan obligation. And it prevents borrowers from abusing the bankruptcy process by ensuring that bankruptcy does not become a convenient and expedient means of extinguishing student loan debt.  It is, for these reasons, an appropriate element of the "undue hardship" inquiry.

C.    The Totality of Circumstances Test Is Inconsistent With Congress's Intent To Impose Strict Limitations On The Discharge Of Student Loan Debt In Bankruptcy.

In contrast to *Brunner*, the totality of circumstances test, in permitting consideration of "any other facts and relevant circumstances surrounding each particular bankruptcy case," *In re Long*, 322 F.2d at 549, leaves the reviewing court with considerable discretion to consider a wide range of

equitable, noneconomic factors in deciding whether to discharge the loan. *See, e.g., In re Reynolds*, 425 F.3d 526 (8th Cir. 2005) (under totality of circumstances test, debt burden's potential impact on a debtor's mental health is enough to constitute an undue hardship, even where that impact would not preclude the debtor from earning sufficient income to repay the debt).

That is problematic for two key reasons. First, it is inconsistent with Congress's intent to protect the financial integrity of the student loan program by imposing strict, statutory limitations on the discharge of student debts in bankruptcy. Congress did not intend to afford bankruptcy courts broad equitable discretion to consider the "totality" of the debtor's circumstances in deciding whether to permit a discharge. The "undue hardship" standard is instead focused on preventing abuses of the bankruptcy process and protecting the solvency of the student loan program. *In re Pelkowski*, 990 F.2d at 743; *Polleys*, 356 F.3d at 1306; *In re Faish*, 72 F.3d at 302. It is manifestly inconsistent with the notion that a bankruptcy court has unbounded discretion to make its own judgments as to whether some equitable factor apart from the debtor's ability to repay warrants excusing the debt. Indeed, "[t]o allow the bankruptcy court, through principles of equity, to grant any more or less than what the clear language

24

of § 523(a)(8) mandates would tantamount to judicial legislation and is something that should be left to Congress, not the courts." *In re Cox*, 338 F.3d 1238, 1243 (11th Cir. 2003) (quotation marks omitted).

Second, a "totality of circumstances" test opens the door to inconsistent, *ad hoc* decision-making. As the Tenth Circuit has reasoned:

> Under this standard, courts may choose from a multitude of factors and apply any combination of them to a given case, suggesting that just about anything the parties may want to offer may be worthy of consideration. As a result, it has an unfortunate tendency to generate lists of factors that should be considered—lists that grow ever longer as the case law develops.

*Polleys*, 356 F.3d at 1309.

Congress intended to circumscribe the authority to discharge student loans. It did not grant bankruptcy courts free-ranging discretion to decide whether some aspect of the debtor's individual, familial, or social circumstances warrants permanently extinguishing all further obligation to make repayment. For this reason as well, the "totality of circumstances" test is ill-suited to congressional purposes.

II.    Whether A Debtor Has Reasonably Sought Relief
       Available Under The Department of Education's Income-
       Contingent Repayment Plan Should Be Given Significant
       Weight In Determining Whether Student Loan Debt May
       Be Discharged In Bankruptcy.

The Department of Education offers several repayment plans that

enable a financially-pressed borrower to reduce monthly payments to a

manageable level.  For example, a parent borrower like the debtor here may

consolidate his PLUS loans and thereafter make reduced monthly payments

under an income-contingent repayment plan.  This plan permits the borrower

to spread repayment over a period of up to 25 years and to cap annual

payments at a level based on family size and adjusted gross income.[6]  34

C.F.R. 685.209(b)(3)(iii)(A); 34 C.F.R. 685.209(b)(1).  The annual amount

of payment due under the plan is recalculated each year in light of, among

other factors, changes in the debtor's adjusted gross income. 34 C.F.R.

685.209(b)(1)(v).  If the borrower does not repay the loan in full at end of

the 25-year repayment period, the unpaid principal and any accrued interest

are cancelled.  34 C.F.R. 685.209(iii)(D).  Depending on the debtor's

---

[6]  Under the income-contingent repayment plan, the annual payment is the
lesser of:  (1) 20 percent of the borrower's discretionary income (defined as
the difference between the poverty line for the borrower's family size and
adjusted gross income) or (2) the amount the borrower would pay if the loan
were amortized over a 12-year period, multiplied by an income percentage
factor corresponding to the borrower's adjusted gross income.  34 C.F.R.
685.209(b)(1)(ii) & (iii)(A).

circumstances, an income contingent-repayment plan can reduce his repayment obligation in a given year to zero.

There are two compelling reasons for placing significant weight on the availability of such debt relief when determining whether excepting a student loan from discharge would impose an undue hardship. First, the income-contingent repayment plan is expressly designed to ensure that monthly payment obligations can be reduced to levels that permit the debtor to retain a reasonable portion of his discretionary income and maintain a reasonable standard of living. The availability of this relief makes it far less likely that the lack of a discharge in bankruptcy will impose an undue economic hardship on the debtor, regardless of whether the reviewing court applies the *Brunner* test or the "totality of circumstances" test.

Second, whereas a bankruptcy discharge *permanently* extinguishes the debt and does not permit further collection if the debtor's circumstances subsequently improve, the income-contingent repayment plan provides for annual reevaluation of the debtor's discretionary income (see 34 C.F.R. 685.209(b)(1)(v)) – a result that protects the debtor from economic hardship while furthering the government's interest in collecting the loan from individuals who may eventually be able to make payment.

An individual's economic circumstances may change over time. Improvements in the national economy may offer new employment prospects, changes in family circumstances may reduce the number of the debtor's dependents, a spouse may enter or reenter the workforce, or the debtor may benefit from an inheritance or other windfall. Considering whether the debtor has or could avail himself of the remedies made available by the Department of Education before seeking a discharge in bankruptcy furthers Congress's intent by ensuring that the debt is not permanently extinguished on the basis of economic difficulties that may prove to be only temporary.

Indeed, the availability of these remedies was an important consideration in Congress's decision to repeal provisions allowing automatic discharge of student loan debts after seven years. Senator Jeffords, in remarks supporting repeal of this seven-year provision, thus explained:

> [A] number of options are available to assist borrowers who are having difficulties repaying their loans, including deferment, forbearance, cancellation and extended, graduated, income-contingent and income-sensitive repayment options. *In just about every case, these options are preferable to declaring bankruptcy.*

144 Cong. Rec. 22,680 (1998) (emphasis added); *see also* H.R. Rep. No. 105-170, 105th Cong., 2d Sess. 408 (1998) (explaining repeal of seven-year discharge provision and noting alternative relief through DoE repayment

options).   Several courts of appeals have consequently held that significant, albeit not controlling, weight must be accorded to whether the debtor has sought relief under an income-contingent repayment plan or similar program.  *See Educational Credit Mgmt. Corp.* v. *Bronsdon*, 421 B.R. 27, 36 (D. Mass. 2009) (collecting cases); *but see Krieger* v. *Educational Credit Mgmt. Corp.*, 713 F.3d 882, 883 (7th Cir. 2013).

The principal objection to taking this relief into account is that an income-contingent repayment plan may in some instances work to the debtor's long-term disadvantage.  Though annual payments are reduced under the plan, interest accrues over a longer period of time and total indebtedness over the life of the plan may thus be greater than the debtor's initial obligation.  As noted above, any principal and interest that remains unpaid at the conclusion of the 25-year repayment period is cancelled. Cancelled debt is considered taxable income up to the value of the borrower's assets at the time immediately prior to the debt's discharge.  26 U.S.C. 61(a)(12), 108(a)(1)(B), 108(a)(3).  It is thus conceivable that a debtor electing the plan may succeed only in substituting a significant tax liability for his initial loan obligation.

That, however, is a remote and highly speculative scenario.  If the debtor can establish that he would be unable to make significant payments

over the 25-year term of an income-contingent repayment plan, that he will

nonetheless have significant assets at the end of that period (thereby

resulting in inclusion of substantial portions of the cancelled debt in taxable

income), and that use of the plan thus would only serve to increase a debt he

cannot pay, then a court could fairly conclude that the availability of such

relief does not mitigate the hardship of denying a discharge in bankruptcy.

Similarly, even apart from potential adverse tax consequences, the

availability of an income-contingent repayment plan may not preclude

discharge if the debtor can demonstrate he has no reasonable prospect of

making any significant payment over the course of the repayment period.

*Cf. Krieger*, 713 F.3d at 884.  In all other circumstances, however, the

income-contingent repayment plan offers a means of obtaining at least some

repayment for the government without overburdening the debtor.  Where

such relief is available, the debtor is not unduly burdened by excepting the

debt from a permanent discharge in bankruptcy.

III.    The Debtor's Age Is Not An Independent Factor
        Supporting Discharge of a PLUS Loan

Finally, a parent debtor who has undertaken a PLUS loan cannot

establish undue hardship merely because of his age.  A parent borrower who

takes out such loans late in his or her work life does so with full knowledge

that repayment may require that he remain employed at or past normal

30

retirement age, that his income may top out or decrease at later stages of his or her career, and that further employment opportunities may be limited. That is part of the bargain that parents strike when they take out loans later in their work life. Permitting older borrowers to nonetheless claim undue hardship and seek a discharge solely on the basis of age defeats the purpose of making loans available to older borrowers in the first instance, especially where the government extends such loans without requiring proof of the debtor's future ability to repay them. Illness or disability may of course dictate a different outcome. But the debtor's health should be considered directly; there is no reason to use age as a proxy for it. The court *can* take into account evidence that age adversely affects the debtor's earning power or ability to remain in the labor force. But the focus should remain on ability to earn, not age alone.

The district court found here that the debtor was well-educated, in continuing good health, and that, notwithstanding his age, "he has a significant period of time remaining during which he can work, and the door on his ability to use that time successfully has by no means closed." Op. 7-8. That analysis correctly focuses on the debtor's ability to repay, not his age.

31

## CONCLUSION

The Court should adopt the *Brunner* standards for determining

whether student loans may be discharged in bankruptcy.

Respectfully submitted,

BENJAMIN C. MIZER
  Principal Deputy Assistant Attorney General

CARMEN M. ORTIZ
  United States Attorney

MICHAEL S. RAAB
  (202) 514-4053

/s/ JEFFREY CLAIR
  (202) 514-4028
  jeffrey.clair@usdoj.gov

  Attorneys, Civil Division
  Room 7243, Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

**FRAP 32(a)(7) CERTIFICATE OF COMPLIANCE**

I certify that this brief has been prepared in Microsoft Word using a

14-point, proportionally spaced font, and that based on word processing

software, the brief contains 6,977 words.

/s/ Jeffrey Clair
jeffrey.clair@usdoj.gov
(202) 514-4028

**CERTIFICATE OF SERVICE**

I certify that on October 13, 2015, I electronically filed the foregoing

Amicus Brief for the United States using the Court's CM/ECF system,

which constitutes service under the Court's rules.  The brief was served in

this manner on:

Steven D. Pohl, Esq.
Brown Rudnick LLP
One Financial Center
Boston, MA  02111
(617)-856-8200
*Counsel for Plaintiff-Appellant*

Adam C. Trampe
Educational Credit Management Corp.
1 Imation Place, Bldg. #2
Oakdale, MN
(651) 325-3308
*Counsel for Defendant-Appellee*

/s/ Jeffrey Clair
jeffrey.clair@usdoj.gov
(202) 514-4028